Paula BRAZIL Plaintiff,

v.

JANSSEN RESEARCH & DEVELOP-
MENT LLC f/k/a Johnson and John-
son Pharmaceutical Research and De-
velopment LLC, et al., Defendants.

CIVIL ACTION NO. 4:15-CV-0204-HLM

United States District Court,
N.D. Georgia, Rome Division.

Signed July 11, 2016

Adam A. Edwards, Justin G. Day, Mark E. Silvey, Greg Coleman Law PC, Knoxville, TN, for Plaintiff.

Christiana C. Jacxsens, Greenberg Traurig, LLP, Atlanta, GA, for Defendants.

## ORDER

HAROLD L. MURPHY, UNITED STATES DISTRICT JUDGE

This case is before the Court on Defendants' Motion to Dismiss [25].

### I. Background

#### A. Plaintiff's Allegations

##### 1. The Parties

Plaintiff is a citizen of the State of Georgia and resides in Dalton, Whitfield County, Georgia. (Am. Compl. (Docket Entry No. 21) ¶ 3.)

Defendant Janssen Research & Development LLC, formerly known as Johnson and Johnson Pharmaceutical Research and Development LLC ("Janssen R&D"), is a limited liability company organized under the laws of New Jersey with its principal place of business in New Brunswick, New Jersey. (Am. Compl. ¶ 7.) Plaintiff alleges that Janssen R&D "is involved in the research, development, sales, and marketing of pharmaceutical products including Invokana." (Id.) Janssen R&D's sole member is Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals"). (Id.) Janssen Pharmaceuticals is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. (Id. ¶¶ 7-8.) According to Plaintiff, Janssen Pharmaceuticals "is involved in the research, development, sales, and/or marketing of pharmaceutical products including Invokana," and "at all relevant times,... was in the business of and did, manufacture, advertise, promote, market, sell, and/or distribute Invokana for treatment of type 2 diabetes." (Id. ¶ 8.)

Defendant Janssen Ortho LLC ("Janssen Ortho") is a Delaware limited liability company with its principal place of business in Puerto Rico. (Am. Compl. ¶ 9.) Plaintiff claims that "at all relevant times,

[Janssen Ortho] was in the business of and did manufacture, advertise, promote, market, sell, and distribute Invokana for use as a drug to treat type 2 diabetes." (Id.) The only member of Janssen Ortho is OMJ PR Holdings, which is incorporated in Ireland and has its principal place of business in Puerto Rico. (Id.) Plaintiff thus states that Janssen Ortho is a citizen of Delaware, Ireland, and Puerto Rico. (Id.)

Defendant Mitsubishi Tanabe Pharma Corporation ("Mitsubishi") is a Japanese corporation with its principal place of business in Osaka, Japan. (Am. Compl. ¶ 10.) According to Plaintiff, Mitsubishi first developed, designed, and tested Invokana and later licensed it to Janssen Pharmaceuticals and its affiliates. (Id.)

Defendants John Does 1-5 are unknown corporations or other legal entities. (Am. Compl. ¶ 11.)

### 2. Development of Invokana

According to Plaintiff, "Defendants" manufactured, marketed, advertised, distributed, promoted, labeled, tested, and sold Invokana as a drug to treat type 2 diabetes. (Am. Compl. ¶ 12.) On May 31, 2012, Janssen R&D submitted a New Drug Application ("NDA") to the United States Food and Drug Administration ("FDA"), seeking approval for the use of canagliflozin, which was later marketed as Invokana. (Id. ¶ 13.) The FDA approved Invokana on March 29, 2013 for use in adults with type 2 diabetes to improve glycemic control. (Id. ¶ 14.) Invokana was the first of a new class of antidiabetic drugs known as sodium glucose co-transporter 2 ("SGLT2") inhibitors, which work by blocking the reabsorbtion of glucose by the kidney, increasing glucose excretion, and lowering blood glucose levels for diabetics who have elevated blood glucose levels, (Id. ¶ 15.)

Plaintiff states that Defendants' marketing materials represent Invokana as a once-a-day pill "that is 'proven to lower blood sugar (A1C).'" (Am. Compl. ¶ 16.) According to Plaintiff, Defendants continue to advertise that Invokana " 'may help you lose weight' " even though Defendants also "explicitly stated that Invokana is not a weight-loss drug." (Id.)

According to Plaintiff, on May 15, 2015, the FDA warned that treatment with SGLT2 inhibitors, including Invokana, could lead to serious complications, including diabetic ketoacidosis. (Am. Compl. ¶ 17.) Diabetic ketoacidosis is a condition where high levels of acid accumulate in the blood and occurs when the body does not have enough insulin to manage glucose levels. (Id.) As a result, the body begins burning fatty acids, creating a waste product called ketones, which trigger the symptoms of ketoacidosis, including nausea, vomiting, abdominal pain, confusion, fatigue, and sleeplessness. (Id.) Plaintiff alleges that other complications associated with Invokana include heart attack, kidney failure, kidney impairment, kidney stones, urinary tract infections, and abnormal weight loss. (Id.)

Plaintiff states that the FDA has identified twenty cases reported as diabetic ketoacidosis, ketoacidosis, or ketosis in patients treated with SGLT2 inhibitors from March 2013 to June 6, 2014, and all of those patients required emergency room visits or hospitalization. (Am. Compl. ¶ 18.) According to Plaintiff, this information was not on the warnings section of the Invokana warning label. (Id.) Plaintiff claims that this lack of warning resulted in patients using Invokana and doctors prescribing Invokana without sufficient information to make an informed decision regarding the drug's safety. (Id.) According to Plaintiff, the Institute for Safe Medication Practices' (the "ISMP") May 6, 2015 edition of Quarter Watch warns about a number of adverse reactions that have been reported about Invokana. (Id. ¶ 19.) According to

the ISMP, 450 serious adverse event reports were filed in the first year after Invokana was related, and many of those were related to kidney problems, including fifty-four reports of kidney failure or impairment, fifty-four cases of severe dehydration or fluid imbalance, eleven cases of kidney stones, and fifty-two cases of abnormal weight loss. (Id.)

Plaintiff alleges that Defendants' warning information for Invokana does not address the increased risk of diabetic ketoacidosis or kidney failure and only states "that a 'possible side effect' of Invokana is 'kidney problems.'" (Am. Compl. ¶ 20.) Plaintiff claims that Invokana was defective and, as a result, people who consumed it, even for a brief period of time like herself, were at an increased risk for developing serious and sometimes life-threatening complications, including ketoacidosis, (Id. ¶ 21.) Plaintiff claims that Defendants withheld knowledge that Invokana can cause serious complications, including diabetic ketoacidosis, from Plaintiff, other consumers, their physicians, the medical community, and the public. (Id. ¶ 22.) Plaintiff suggests that other safer alternatives to Invokana were available to treat type 2 diabetes and that consumers who used Invokana were not adequately warned about the risks and benefits associated with Invokana. (Id. ¶¶ 23-24.) Plaintiff alleges that Invokana is unreasonably dangerous and defective as formulated. (Id. ¶ 25.) Plaintiff claims that Defendants knew or should have known that Invokana was associated with serious complications and could cause diabetic ketoacidosis, (Id. ¶ 26.)

According to Plaintiff, Defendants continue to promote Invokana as a safe and effective treatment for people with type 2 diabetes, despite knowing about the risks associated with it. (Am. Compl. ¶ 27.) In 2014, $19.8 million was spent marketing Invokana to doctors and hospitals, which represents the second highest amount spent for marketing any pharmaceutical drug that year. (Id. ¶ 28.) Plaintiff states that Defendants reported 2014 domestic sales of Invokana in the amount of $569 million and, as of June 2015, domestic sales had reach a total amount of $266 million. (Id. ¶ 29.)

### 3. Plaintiff's Use of Invokana

Plaintiff suffers from type 2 diabetes, and began using Invokana, as prescribed by her physician, to treat her diabetes on October 21, 2013. (Am. Compl. ¶¶ 4, 31.) After using Invokana, Plaintiff began losing weight and suffered nausea and vomiting, (Id. ¶¶ 5, 32.) On or around November, 3, 2013, Plaintiff was admitted to Hamilton Medical Center to treat her nausea and vomiting and was diagnosed with diabetic ketoacidosis. (Id. ¶ 5, 32.) Plaintiff claims that, had Defendants properly disclosed the risks associated with Invokana, she would not have used it because safer alternatives were available. (Id. ¶ 32.)

### 4. Plaintiff's Claims

Count I of Plaintiff's Complaint is a strict liability claim against all Defendants. (Am. Compl. ¶ 33-47.) Plaintiff claims that Janssen R&D and Mitsubishi defectively designed Invokana and that Janssen Pharm and Janssen Ortho failed to properly market, manufacture, distribute, supply, and sell the drug, including failing to warn and placing adequate warning and instructions on Invokana. (Id. ¶ 44.) Plaintiff alleges that, as a result of her ingestion of Invokana, she suffered diabetic ketoacidosis, leading to significant weight loss, nausea, and vomiting, as well as continued injury, emotional distress, and economic loss. (Id. 47.)

In Count II, Plaintiff alleges a design defect claim against Janssen R&D and Mitsubishi. (Am. Compl. ¶¶ 48-56.) Plaintiff claims that Invokana is "defectively designed because it is capable of causing

serious medical conditions, such as kidney failure and ketoacidosis" (id. ¶ 51) and because the design "fails to adequately warn that it causes ketoacidosis," has risks that outweigh the benefits of glucose control, and was capable of being made more safe (id. ¶ 54).

Count III asserts a failure to warn claim against Janssen Pharmaceuticals and Janssen Ortho. (Am. Compl. ¶¶ 57-73.) Plaintiff states that, according to the FDA's Label and Approval History, only one label was in use during 2013, which the FDA had approved in March 2013. (Id. ¶ 61.) According to Plaintiff, the 2013 label mentioned ketoacidosis three times, indicating that Invokana: (1) is "[n]ot for treatment of…diabetic ketoacidosis"; (2) "is not recommended … for the treatment diabetic ketoacidosis"; and (3) "is not for people with diabetic ketoacidosis (increased ketones in blood or urine)." (Id. ¶ 62.) Plaintiff alleges that the label did not warn that Invokana could cause ketoacidosis, and instead only contained a general warning that "kidney problems" are a possible side effect. (Id.) Plaintiff further states that the first six additions or revisions to the original Invokana label, as tracked on the FDA's website for Label Information and Approval History, failed to warn of ketoacidosis as a side effect. (Id. ¶¶ 63-64.) Janssen Pharmaceuticals and Janssen Ortho did not include a warning about ketoacidosis until a revision on December 4, 2015. (Id. ¶ 65.) The December 4, 2015 revision contains multiple specific warnings that Invokana may cause ketoacidosis as well as instructions to physicians on advising patients about the risks of ketoacidosis and its symptoms. (Id. ¶¶ 65-67.) Plaintiff contends that Janssen Pharmaceuticals and Janssen Ortho knew or reasonably should have known about and provided warnings about the risks of Invokana, which could lead to diabetic ketoacidosis. (Id. ¶ 68.)

Count IV alleges that all Defendants were negligent. (Am. Compl. ¶¶ 74-80.) In Count V, Plaintiff claims Janssen Pharmaceuticals and Janssen Ortho violated the Georgia Fair Business Practices Act of 1975, O.C.G.A. § 10–1–390 et seq. (Id. ¶¶ 81-90.) Plaintiff alleges that Janssen Pharmaceuticals and Janssen Ortho's sale of Invokana constitutes an unfair or deceptive trade practice and used false and misleading representations or omission of material fact relating to Invokana's safety. (Id. ¶¶ 86-87.) Finally, in Count VI, Plaintiff requests an award of punitive damages against all Defendants, (Id. ¶¶ 91-96.)

## B. Procedural Background

Plaintiff filed this case on October 29, 2015. (Docket Entry No. 1.) On March 24, 2016, the Court entered an Order dismissing Plaintiff's Complaint and ordering Plaintiff to file an Amended Complaint. (Order of Mar. 24, 2016 (Docket Entry No. 20).) Plaintiff filed her Amended Complaint on April 14, 2016. (Docket Entry No. 21.) On May 16, 2016, Janssen Ortho, Janssen Pharmaceuticals, and Janssen R&D (collectively "Defendants")[1], filed their second Motion to Dismiss. (Docket Entry No. 25.) The briefing process for that Motion is now complete, and the Court finds that the matter is ripe for resolution.

## II. Discussion

### A. Standard Governing a 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint, or portions of a complaint, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When

1. According to Defendants, Mitsubishi has not been served and this Motion is therefore not brought on behalf of Mitsubishi. (Br. Supp. Mot. Dismiss (Docket Entry No. 25–1) at 2 n.2.)

reviewing a motion to dismiss, the Court must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. Alvarez v. Attorney Gen. for Fla., 679 F.3d 1257, 1261 (11th Cir.2012).

Although a court is required to accept well-pleaded facts as true when evaluating a motion to dismiss, it is not required to accept the plaintiff's legal conclusions. Chandler v. Sec'y of Fla. Dep't of Transp., 695 F.3d 1194, 1199 (11th Cir.2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). The Court also does not accept as true "unwarranted deductions of fact or legal conclusions masquerading as facts." Snow v. DirecTV, Inc., 450 F.3d 1314, 1320 (11th Cir.2006) (internal quotation marks and citation omitted).

Finally, the Court may dismiss a complaint if it does not plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 708 (11th Cir.2014) (internal quotation marks omitted) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). In Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court observed that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S.Ct. 1955. Although factual allegations in a complaint need not be detailed, those allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. The mere possibility that the defendant might have acted unlawfully is not sufficient to allow a claim to survive a motion to dismiss. Id. Instead, the well-pleaded allegations of the complaint must move the claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

## B. Count I—Strict Liability

▌ O.C.G.A. § 51–1–11(b)(1) states:

The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

O.C.G.A. § 51–1–11(b)(1). To state a claim for strict liability, the plaintiff must show that (1) the defendant was the manufacturer of the product; (2) the product, when sold, was not merchantable and reasonably suited to the use intended, and (3) the product's defective condition proximately caused plaintiffs injury. Chicago Hardware & Fixture Co. v. Letterman, 236 Ga.App. 21, 23, 510 S.E.2d 875, 877 (1999). Under Georgia law, "[t]here are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects." Banks v. ICI Americas, Inc., 264 Ga. 732, 733, 450 S.E.2d 671, 672 (1994).[2]

---

**2.** Count I of the Amended Complaint discusses each of the three categories of product defects. (See e.g., Am. Compl. ¶ 45 (stating that Invokana was defectively designed, defec-

tively manufactured, and had inadequate warnings).) The Court does not see how Counts II and III of the Amended Complaint,

### 1. Manufacturing Defect

■ Defendants argue that the Amended Complaint does not state a strict liability claim for a manufacturing defect because Plaintiff has not alleged any specific manufacturing defect. (Br. Supp. Mot. Dismiss at 7.) Plaintiff points to paragraph seventeen of the Amended Complaint as a sufficient allegation of the flawed effect of Invokana. (Resp. Mot. Dismiss at 2, 5-6.) That paragraph states:

On May 15, 2015, the FDA warned that treatment with SGLT2 inhibitors, including Invokana®, may lead to serious complications, including diabetic ketoacidosis—a condition of high levels of acid accumulating in the blood. This condition happens when the body does not have enough insulin to manage glucose levels. The body begins burning fatty acids, which results in a waste product known as ketones. These ketones are what trigger the symptoms of ketoacidosis. These symptoms include difficulty breathing, nausea or vomiting, abdominal pain, confusion, fatigue and sleeplessness. Other complications associated with Invokana® include heart attack, kidney failure, kidney impairment, kidney stones, urinary tract infections, and abnormal weight loss.

(Am. Compl.¶ 17.)[3]

■ To allege a manufacturing defect Plaintiff must allege the existence of a specific manufacturing defect that proximately caused the harm. Henderson v. Sun Pharm. Indus., Ltd., No. 4:11–CV–0060–HLM, 2011 WL 4024656, at *5 (N.D.Ga.

June 9, 2011). A manufacturing defect is one where there was flaw from the manufacturing process not in the design or specifications of the product. See Fletcher v. Water Applications Distribution Grp., Inc., 333 Ga.App. 693, 697, 773 S.E.2d 859, 863 (2015) ("Generally, a manufacturing defect results from an error specifically in the fabrication process, as distinct from an error in the design process."). "Thus, by definition, a manufacturing defect will always be identifiable as a deviation from some objective standard or a departure from the manufacturer's specifications established for the creation of the product." Jones v. Amazing Prod's, Inc., 231 F.Supp.2d 1228, 1236 (N.D.Ga.2002). "Therefore, in a manufacturing defect case, the 'product's defectiveness is determined by measuring the product in question against the benchmark of the manufacturer's designs.'" In re Mentor Corp. ObTape Transobturator Sling Prod.'s Liab. Litig., 711 F.Supp.2d 1348, 1365 (M.D.Ga. 2010) (quoting ACE Fire Underwriters Ins. Co. v. ALC Controls, Inc., No. CIV.A. 1:07–CV–606–T, 2008 WL 2229121, at *2 (N.D.Ga. May 28, 2008)).

Amended Complaint ¶ 17 does not allege the existence of a manufacturing defect because it does not so much as suggest that the manufactured Invokana differed in any way from the manufacturer's design specifications. The Amended Complaint thus fails to state a claim for a manufacturing defect, and the Court grants this portion of the Motion to Dismiss.

---

alleging claims for defective design and failure to warn, differ from the strict liability claims in Count I. Plaintiffs Response to the Motion to Dismiss does not discuss Counts II and III separately from Count I, and Plaintiff does not explain any way in which they differ. (See generally Resp. Mot. Dismiss (Docket Entry No. 28).)

**3.** The original Complaint contained the exact same paragraph. (Compl. (Docket Entry No.

1) ¶ 17.) Plaintiff's claim that, based on Amended Complaint ¶ 17, she "has now corrected her" failure to provide enough specificity by amending the Complaint is thus disingenuous. The Court's previous Order found, despite the exact same paragraph, that Plaintiff failed to allege a specific manufacturing defect. (Order of Mar. 25, 2016 at 44-45.)

## 2. Design Defect

■ Defendants also argue that Plaintiff failed to allege the existence of a specific design defect. (Br. Supp. Mot. Dismiss at 7-9.) Plaintiff again points to Amended Complaint ¶ 17, as well as her allegations in Amended Complaint ¶ 19 that there were 450 serious adverse event reports for Invokana in the first year after it was released. (Resp. Mot. Dismiss at 5-6.)

"While a 'manufacturing defect' is a fairly straightforward concept, a 'design defect' is a far more diffuse proposition under Georgia Supreme Court precedent, as the latter calls for the finder of fact to employ a loose balancing test to determine whether the manufacturer properly designed the product." Amazing Prod's, 231 F.Supp.2d at 1236. The Georgia Supreme Court further explained:

> Unlike a manufacturing defect case, wherein it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use, in a design defect case the entire product line may be called into question and there is typically no readily ascertainable external measure of defectiveness. It is only in design defect cases that the court is called upon to supply the standard for defectiveness: the term "defect" in design defect cases is an expression of the legal conclusion to be reached, rather than a test for reaching that conclusion.

Banks v. ICI Americas, Inc., 264 Ga. 732, 733–34, 450 S.E.2d 671, 673 (1994).

The Court previously rejected the contention that these exact same allegations sufficiently alleged a defective design. (Mar. 24, 2016 Order at 44-45.) Plaintiff has not provided any additional or more specific factual allegations to the Amended Complaint. It is unclear from the Amended Complaint and Plaintiff's briefing as to what the alleged design defect is. Possibly, Plaintiff is attempting to say that any treatment with SGLT2 inhibitors is unreasonably dangerous and would fail the multi-factor balancing test for a design defect. Plaintiff, however, has not said that or made such a position clear. Merely describing how Invokana works is insufficient to describe a defect. See Fleming v. Janssen Pharm., Inc., No. 215CV02799JPMDKV, 186 F.Supp.3d 826, 835, 2016 WL 3180299, at *7 (W.D.Tenn. May 6, 2016) ("The only assertion as to how the product design was defective is a description of how the class of products works. The Court cannot reasonably infer from the generic description of SGLT2 inhibitors' mechanism of action that Invokana was defective or unreasonably dangerous." (citation omitted)) The Amended Complaint provides no notice to Defendants of what the alleged wrongdoing is. The Court therefore grants this portion of the Motion to Dismiss.

## 3. Failure to Warn

■ Defendants first contend that Plaintiff's failure to warn claim fails because it is based on a failure to warn about a risk of kidney failure, and she does not allege that she experienced kidney failure. (Br. Supp. Mot. Dismiss at 10-11.) Second, Defendant argues that Plaintiff failed to allege facts supporting "a reasonable inference that Defendants had a duty to warn about" the risk of diabetic ketoacidosis because Plaintiff has not alleged facts showing Defendants knew or should have known about that risk. (Id. at 11–13.) Third, Defendants say that Plaintiff has not alleged that her physician would have made a different prescribing decision had the physician received an adequate warning. (Id. at 13–14.)

■ Even if a product is not defective, a manufacturer still may be liable under a failure to warn theory. Battersby v. Boyer, 241 Ga.App. 115, 117, 526 S.E.2d

159, 162 (1999). To establish a failure to warn claim, "a plaintiff must show that (1) the defendant knew, or had reason to know, that the product is likely to be dangerous for the intended use; (2) the defendant had no reason to believe that the user would realize the danger; and (3) the defendant failed to exercise reasonable care to inform the user about the danger." Carmical v. Bell Helicopter Textron, Inc., 117 F.3d 490, 494–95 (11th Cir.1997) (applying Georgia law).

First, the Court rejects Defendant's contention that Plaintiff's strict liability failure to warn claim is based on a risk of an injury that she did not suffer. The Amended Complaint states that Invokana was defective due to inadequate warning about the risk of diabetic ketoacidosis. (Am. Compl. ¶ 42.) The Amended Complaint also states that Plaintiff suffered diabetic ketoacidosis. (Id. ¶ 32.)

■ Second, the Court finds that the Amended Complaint adequately alleges that Defendants knew or should have known about the risks of Invokana causing diabetic ketoacidosis. Defendants are correct that allegations simply stating that, for instance, that Janssen Pharmaceuticals and Janssen Ortho "knew or should have known that Invokana created an unreasonable risk of serious and dangerous side effects, including increased risk of diabetic ketoacidosis," are legal conclusions and mere recitations of the element of the claim. Alone, those allegations would not allow Plaintiff to state a claim. The

Amended Complaint, however, provides some facts showing that, soon after Invokana entered the market, numerous reports of adverse reactions, including ketoacidosis, were reported.[4] Additionally, Defendants warned against using Invokana to treat patients with ketoacidosis, possibly showing that Defendants were aware of an adverse relationship between the two. While the issue is a close one, the Court finds that Plaintiff has alleged sufficient facts to plausibly allege that Defendants knew there was a risk of Invokana causing diabetic ketoacidosis. The cases cited by Defendants resolve summary judgment motions addressing the sufficiency of the plaintiff's evidence, which is not the appropriate inquiry at this time. Stupak v. Hoffman–La Roche. Inc., 326 Fed.Appx. 553, 555 (11th Cir.2009) (reviewing the granting of a motion for summary judgment); Rodriguez v. Stryker Corp., 680 F.3d 568, 570 (6th Cir.2012) (same and discussing how the district court weighed the evidence); Smith v. Peddinghaus Corp., No. CIVA 1:06CV990 GET, 2007 WL 2484315, at *5 (N.D.Ga. Aug. 29, 2007) (granting a motion for summary judgment after examining the evidence).

Third, Plaintiff argues that, at the pleading stage, she cannot say what Plaintiff's physician would have done with a stronger warning, but that Defendants have made their warnings about ketoacidosis more robust, suggesting that a stronger warning would be more effective. (Resp. Mot. Dis-

---

4. Plaintiff attaches to her Response an exhibit from the ISMP to show Defendants' knowledge and asks that the Court take judicial notice of the facts contained in that document. (Resp. Mot. Dismiss at 7 n.7; Resp. Mot. Dismiss Ex. A (Docket Entry No. 28–1).) The Court "may take judicial notice of matters of public record without converting a motion to dismiss into one for summary judgment." Klopfenstein v. Deutsche Bank Sec., Inc., 592 Fed.Appx. 812, 816 (11th Cir.2014). Just because something is public does not make it a public record. See Fed. R. Evid. 201(b)(stating that a court may judicially notice a fact that "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Plaintiff has not shown that the ISMP document is such a record, and thus the Court does not consider it.

miss at 9 n.2.)[5] The Amended Complaint does allege that: "Janssen [Pharmaceuticals] and Janssen Ortho failed to properly warn [ ] Plaintiff's physicians of the risks associated with Invokana, which prevented the physicians from properly warning their patients of those risks, including those relating to the effects of ketoacidosis." (Am. Compl. ¶ 59.) The Amended Complaint also alleges that safer alternatives were available and that Plaintiff was not adequately warned about the risks and benefits of Invokana. (Id. ¶¶ 23-24.) The Amended Complaint further states: "Plaintiff would not have used Invokana had Defendants properly disclosed the risks associated with its use, as safer alternatives were available." (Id. ¶ 32.) While these allegations border on conclusory, the Court finds that the Amended Complaint has stated enough at this time to allege causation.

### C. Count II—Design Defect

Count II of the Amended Complaint fails for the same reasons the design defect portion of Count I failed. Defendant also argues that because the Court found Plaintiffs design defect claims were preempted except on a failure to warn theory, Count II is brought against the wrong Defendants because Janssen R&D is not responsible for the drug's labeling. (Br. Supp. Mot. Dismiss at 14-15.) Despite briefing the preemption issue, Plaintiff does not appear to respond to this argument, and Plaintiff therefore has abandoned this claim. Bute v. Schuller Int'l, Inc., 998 F.Supp. 1473, 1477 (N.D.Ga.1998) ("Because plaintiff has failed to respond to this argument or otherwise address this claim, the Court deems it abandoned."); Welch v. Delta Air Lines, Inc., 978 F.Supp. 1133, 1137 (N.D.Ga.1997) ("Plaintiff's fail-

ure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). The Court thus grants this portion of the Motion to Dismiss.

### D. Count III—Failure to Warn

Count III succeeds for the same reasons discussed supra Part II.B.3. In fact, in that discussion the Court addressed relevant allegations contained in Count III. The Court thus denies this portion of the Motion to Dismiss.

### E. Count IV—Negligence

Defendants contend that because "Plaintiff's negligence claim is premised on an alleged failure to properly design, manufacture and label Invokana," Plaintiff's "negligence claim therefore fails for the same reasons as her strict liability claim." (Br. Supp. Mot. Dismiss at 15-16.) Plaintiff responds in kind. (Resp. Mot. Dismiss at 9 ("For the reasons argued above regarding strict liability, [ ] Plaintiff has now properly pled her claims for negligence and [ ] Defendants' motions in this regard should be denied.").)

"Under Georgia law, a plaintiff asserting a negligence claim must prove the following elements: '(1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risk of harm; (2) breach of this standard; (3) a legally attributable causal connection between the conduct and resulting injury; and, (4) some loss or damage flowing to the plaintiffs legally protected interest as a result of the alleged breach of the legal duty.'" Henderson, 2011 WL 4024656, at *7 (quoting Estate of

---

**5.** Plaintiff also contends that "Defendants also erroneously claim that the Plaintiff did not adequately allege how the warnings were defective or how the defect caused Plaintiffs injuries." (Resp. Mot. Dismiss at 8.) The Court does not read Defendants' brief as moving to dismiss the failure to warn claims on this basis. The Court further finds that Plaintiff has sufficiently alleged how the warnings were defective.

Thornton v. Unum Life Ins. Co. of Am., 445 F.Supp.2d 1379, 1382 (N.D.Ga.2006)). Plaintiff "does not specify how any specific Defendant breached any duty in connection with Plaintiff." Id. at *8. Indeed, Count IV of the Amended Complaint contains largely conclusory legal allegations. In light of the agreement between the Parties that Plaintiff's negligence claims should be decided in the same manner as the strict liability claims, the Court dismisses Plaintiff's claims of negligence except to the extent they are based on a negligent failure to warn.

### F. Count V—Georgia Fair Business Practices Act

▮ In its Order of March 24, 2016, the Court dismissed Plaintiff's claim under the Georgia Fair Business Practices Act, explaining:

> Pursuant to the language of OCGA § 10–1–399(a), however, 'a private FBPA claim has three elements: a violation of the Act, causation, and injury.'" Tiismann v. Linda Martin Homes Corp., 279 Ga. 137, 139, 610 S.E.2d 68, 70 (2005) (quoting Zeeman v. Black, 156 Ga.App. 82, 86–87, 273 S.E.2d 910, 916 (1980)). Once again, Plaintiff's allegations amount merely to restating the elements of the cause of action without any factual support. Plaintiff pleads merely that Defendants violated the consumer protection laws through the use of false and misleading misrepresentations. In doing so, Plaintiff provides no factual support for that legal conclusion. Plaintiff's Complaint therefore fails to state a plausible claim for relief.

(Mar. 24, 2016 Order at 55-56.) The Amended Complaint contains the exact same allegations with only two minor alterations. Plaintiff substituted Janssen Pharmaceuticals and Janssen Ortho for "Defendants," and Plaintiff changed the order of the paragraphs of the Count. The Amended Complaint is in all other respects identical to the dismissed count of the first Complaint. While the Court did criticize the Complaint for using "Defendants," the Court also indicated that Plaintiff's allegations were legal conclusions and needed factual support. Because Plaintiff has failed to make any of those amendments, the Court grants this portion of the Motion to Dismiss and dismisses Count V of the Amended Complaint.

### G. Count VI—Punitive Damages

Defendants seek the Court to dismiss Plaintiff's claim for punitive damage for lack of factual support. (Br. Supp. Mot. Dismiss at 16-17.) Plaintiff's allegations are sufficient to state a claim for relief for punitive damages. See DirecTV, LLC v. Shirah, No. CV413–110, 2014 WL 1002778, at *2 (S.D.Ga. Mar. 12, 2014) ("It is true that a prayer for damages is not itself an allegation and facts must be pled that could give rise to a punitive damages award. However, Plaintiff's complaint clearly alleges that Defendants intentionally intercepted its satellite broadcast signal for use in a commercial establishment without authorization. At this stage in the litigation, the Court finds that Plaintiff has met its burden of pleading a 'short and plain statement of the claim' to at least potentially support a prayer for punitive damages." (citations omitted)). Plaintiff has pleaded sufficient facts elsewhere in the Amended Complaint to support its request of punitive damages. The Court thus denies this portion of Defendants' Motion to Dismiss.

### C. Preemption
#### 1. Design Defect

▮ Finally, Defendants contend that Plaintiff's design defect claims are preempted because federal law precludes Defendant manufacturers from redesigning a prescription drug without FDA approval. (Mot. Dismiss at 18-25.) Specifi-

cally, Defendants "seek an order that Plaintiff cannot *also* premise her design claims on a failure to change the chemical design of Invokana." (Reply Mot. Dismiss (Docket Entry No. 30) at 8 (emphasis in original).) Plaintiff argues that the cases cited by Defendants do not require dismissal and are distinguishable because they only apply to generic, and not brand name, drugs. (Resp. Mot. Dismiss at 19-21.)

In its March 24, 2016 Order, the Court thoroughly reviewed the law of conflict preemption as applied to pharmaceutical manufacturers. (Mar. 24, 2016 Order at 56-82.) Specifically, the Court found this case distinguishable from the Supreme Court's decision in Mut. Pharm. Co. v. Bartlett, —— U.S. ——, 133 S.Ct. 2466, 186 L.Ed.2d 607 (2013). The defendant in Bartlett was a generic drug manufacturer. Bartlett, 133 S.Ct. at 2470. In determining whether federal law preempted a design defect claim from New Hampshire, the Supreme Court compared the duties required by federal law and New Hampshire's product liability law. Id. at 2471. The Supreme Court found that New Hampshire's law requiring that products not be "unreasonably dangerous" could "be satisfied either by changing a drug's design or by changing its labeling." Id. at 2474. The drug in question could not be redesigned, in part because of FDA regulations. Id. Additionally, as a generic drug manufacturer, the defendant could not change the warning on the drug Id. at 2476 ("As [PLIVA. Inc. v. Mensing, 564 U.S. 604, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011)] made clear, federal law prevents generic drug manufacturers from changing their labels.... Thus, federal law prohibited Mutual from taking the remedial action required to avoid liability under New Hampshire law."). The Supreme Court thus held that the New Hampshire design defect claim was preempted because the defendant could neither redesign the drug or strengthen the warning, in compliance with its state law duties without running afoul of federal regulations. Id. at 2477 (footnotes omitted).

In its March 24, 2016, Order, the Court thus followed the pattern of analysis from Bartlett, examined Georgia's product liability law and determined "Georgia's risk-utility analysis for design defect claims closely resembles the analysis used by New Hampshire that the Supreme Court analyzed in Bartlett" as Georgia law "allows a drug manufacturer to ameliorate the risks of danger of the drug and thus to fulfill its legal duty by improving the warnings attached to the product." (Mar. 24, 2016 Order at 72-75.) The Court then distinguished the present case from Bartlett, because this case involves manufacturer(s) of a brand name drug, and the Supreme Court has said that "a brand name drug manufacturer may use the FDA's CBE regulation to unilaterally change its labeling without prior FDA approval." (Id. at 75–76 (citing Wyeth v. Levine, 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) and, Mensing, 131 S.Ct. 2567.) This Court thus concluded that Plaintiff's design defect claims are not preempted because some of Defendants can strengthen the warnings in Invokana's labeling without prior FDA approval. (Id. at 76 ("State law claims, including a design defect claim, requiring a brand name drug manufacturer to provide a more robust warning are therefore not preempted.").) Any claim by Plaintiff that Defendants should change the formulation of Invokana is preempted by FDA regulations. Plaintiff, however, may argue that Defendants should be liable because a stronger warning would have changed Invokana's risk-utility profile to make it not unreasonable dangerous.

To the extent the Parties are trying to reargue that decision, the cases cited by them do not convince the Court of a need to change its conclusion. The Court previ-

ously discussed the Sixth Circuit's decision in Yates v. Ortho–McNeil–Janssen Pharm., Inc., 808 F.3d 281 (6th Cir.2015). (Mar. 24, 2016 Order at 77-81.) In re Celexa & Lexapro Mktg. & Sales Practices Litig., 779 F.3d 34 (1st Cir.2015) did not hold that all failure to warn claims against brand name drug manufacturers are preempted. Instead, the First Circuit decided that the claim in that specific case was preempted because, under the specific facts of the case, the CBE procedure was not available to the brand name drug manufacturer. In re Celexa & Lexapro Mktg. & Sales Practices Litig., 779 F.3d at 41–43.

Barcal v. EMD Serono, Inc., No. 5:14–CV–01709–MHH, 2016 WL 1086028 (N.D.Ala. Mar. 21, 2016) applied Alabama's product liability law and only found preemption of claims requiring changes to a drug's chemical composition. 2016 WL 1086028 at *3–4. Batoh v. McNeil–PPC, Inc., No. 3:14–CV–01462, 167 F.Supp.3d 296, 2016 WL 922779 (D.Conn. Mar. 10, 2016) held that conflict preemption barred a claim that defendants should have altered the chemical composition of a drug but did not bar a failure to warn theory. 167 F.Supp.3d at 320-21, 322-23, 2016 WL 922779, at *16, 18. The reasoning in Batoh largely supports this Court's conclusion.

The Court also rejects Plaintiff's argument that her claim is not preempted because her "claim is on the original design of Invokana before FDA approval, not Defendants' failure to redesign the drug after FDA approval." (Resp. Mot. Dismiss at 16.) This original design theory of liability makes little sense in the face of the Supreme Court's precedents. The Supreme Court has repeatedly characterized the state tort law at issue in this case as a duty to make changes or as a remedial

effort. See e.g., Mensing, 564 U.S. at 618, 131 S.Ct. 2567 (finding the "state-law duty to change the label" conflicted with the "federal law duty to keep the label the same"); Bartlett, 133 S.Ct. at 2474 ("The New Hampshire Supreme Court has recognized that this duty can be satisfied either by changing a drug's design or by changing its labeling."), 2476 (stating that New Hampshire law required taking remedial action). Indeed, it is unclear how any of the lawsuits in Bartlett, Mensing, or Levine could have even had an issue with preemption if the duty required by state law covered the original design. To the extent, Plaintiff argues Defendants should have never sold Invokana, the Court notes that the Supreme Court rejected a "stop-selling" rationale in Bartlett. Bartlett, 133 S.Ct. at 2477 ("The Court of Appeals reasoned that Mutual could escape the impossibility of complying with both its federal- and state-law duties by 'choos[ing] not to make [sulindac] at all.' We reject this 'stop-selling' rationale as incompatible with our pre-emption jurisprudence, (alteration in original) (citation omitted)).

Based on the foregoing reasons, the Court finds that Plaintiff's design defect claim is not preempted to the extent it relies on the sufficiency labeling of Invokana and not its chemical composition.

### 2. Janssen Ortho

 Defendants argue that Plaintiff's claims against Janssen Ortho, which are premised on a failure to warn, are preempted because Janssen Ortho is not the NDA applicant and thus cannot seek to change Invokana's label. (Br. Supp. Mot. Dismiss at 23-25.) Janssen R&D holds the NDA for Invokana.[6] The Court agrees. When a company does not have the NDA,

---

**6.** The Court need not take judicial notice of the FDA's online database, because this is the fact pled in the Amended Complaint and shown in the NDA Approval Letter attached to the Amended Complaint, which was sent to Janssen R&D (Am. Compl. ¶ 13; Am. Compl. Ex. A (Docket Entry No. 25–1).)

it has "no more power to change the label" of a drug than a generic manufacturer. In re Darvocet, Darvon, & Propoxyphene Products Liab. Litig., 756 F.3d 917, 940 (6th Cir.2014). A distributor, even of a brand name drug, "has no power to change... labeling. That power lies with the applicant who filed the New Drug Application (NDA)." In re Fosamax (Alendronate Sodium) Products Liab. Litig. (No. II), No. MDL 2243 JAP–LHG, 2012 WL 181411, at *3 (D.N.J. Jan. 17, 2012). "Because [Janssen Ortho] could not 'independently do under federal law what state law requires of it,' the state law claims brought against it are preempted." id., 2012 WL 181411, at *4 (quoting Mensing, 131 S.Ct. at 2579). In re Actos (Pioglitazone) Products Liab. Litig., No. 6:11–MD–2299, 2014 WL 4364832 (W.D.La. Sept. 2, 2014), is distinguishable from the present case as it had more detailed allegations and evidence. 2014 WL 4364832 at *52 n. 160 ("There are marked differences between the procedural postures in In re Fosamax (a ruling on a pre-trial motion) and the instant case (a Rule 50 motion presenting both legal and factual challenges to a trial record), which make it difficult for this Court to elicit guidance from the In re Fosamax opinion, particularly in light of the dearth of detailed allegations or evidence of conduct or knowledge that the

plaintiffs might have made in that case, when compared to the plethora made by Plaintiffs in this case."). This case is much closer to In re Fosamax. Additionally, In re Actos involved allegations of a failed warning in other documents, including marketing literature, while this case has allegations specific to the label attached to Invokana, and in that case there was evidence of a co-promotion agreement, of which there are no such allegations here.[7] In re Actos, 2014 WL 4364832 at *17.[8] The Court therefore grants this portion of the Motion to Dismiss and dismisses Count III and Count IV against Janssen Ortho and Count I against Janssen Ortho, only to the extent such a claim is based on a failure to warn.[9] Because this Order dismisses the substantive claims against Janssen Ortho, the Court also dismisses the punitive damages claim against Janssen Ortho.

## IV. Conclusion

ACCORDINGLY, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss [25]. The Court **GRANTS** Defendants' Motion to Dismiss and **DISMISSES:** (1) Count I of the Amended Complaint's manufacturing defect claim, design defect claim, and failure to warn claim against Janssen Ortho; (2) Count II; (3) Count III against Janssen

**7.** Plaintiff provides no reason why any involvement by Mitsubishi is relevant to Janssen Ortho.

**8.** The Court otherwise finds this portion of In re Actos to be unpersuasive.

**9.** Plaintiffs Response to the Motion to Dismiss also included a "Request for Limited Discovery" in the event the Court was inclined to find for Defendants on the jurisdictional and preemption arguments. (Resp. Mot. Dismiss at 24-25.) The Court denies Plaintiff's request and instead this case will proceed in the usual manner. First, jurisdiction is not at issue in this motion to dismiss. Preemption goes to the merits of the case, not jurisdiction. Hunter v.

Philip Morris USA, 582 F.3d 1039, 1045 (9th Cir.2009) ("The preemption defense, by contrast, goes to the merits of the plaintiffs case."). Second, the discovery Plaintiff requests is by no means limited. Third, "the request was not presented by proper motion." John Gallup & Associates, LLC v. Conlow, No. 1:12–CV–03779–RWS, 2013 WL 3191005, at *11 (N.D.Ga. June 21, 2013); see also Mother Doe I v. Al Maktoum, 632 F.Supp.2d 1130, 1146 (S.D.Fla.2007) ("The 'requests' for jurisdictional discovery contained in Plaintiffs' memoranda in opposition to Defendants' Motion to Dismiss are not a substitute for the issuance of discovery requests or the filing of a formal motion to take discovery.").

Ortho; (4) Count IV against Janssen Ortho in its entirety and against all other Defendants except to the extent it is based on a negligent failure to warn; (5) Count V; and (6) Count VI against Janssen Ortho. The Court thus dismisses all of Plaintiff's claims against Janssen Ortho. The Court otherwise **DENIES** Defendants' Motion to Dismiss.

IT IS SO ORDERED, this the 11th day of July, 2016.